IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN HAMPTON, | ) | CASE NO. 1:18-CV-1433 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Brian Hampton ("Hampton") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to consent of the parties.  Doc. 11.

As set forth below, the ALJ's assessment of Hampton's treating source opinion is not

supported by substantial evidence.  Accordingly, the Commissioner's decision is **REVERSED**

**and REMANDED** for proceedings consistent with this opinion.

## I. Procedural History

Hampton filed applications for DIB and SSI in April and May 2015, respectively,

alleging a disability onset date of February 7, 2015.  Tr. 233, 235.  He alleged disability based on

the following: multiple sclerosis; cognitive issues (memory, decision making, confusion);

difficulty expressing thoughts; "my mom has to point things out for me, guide me to them";

numbness in hands and feet; muscle spasms; spinal cord pain; balancing and clumsiness;

frequent urination; and slowed reflexes.  Tr. 275.  After denials by the state agency initially (Tr.

130, 131) and on reconsideration (Tr. 166, 167), Hampton requested an administrative hearing (Tr. 185). A hearing was held before an Administrative Law ("ALJ") on June 30, 2017. Tr. 52-95. In his November 15, 2017, decision (Tr. 23-36), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Hampton can perform, i.e. he is not disabled. Tr. 34-35. Hampton requested review of the ALJ's decision by the Appeals Council (Tr. 226) and, on May 30, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Hampton was born in 1988 and was 27 years old on his alleged onset date. Tr. 233. He graduated from high school. Tr. 61. He previously worked doing various jobs at restaurants, including as a manager, and last worked in February 2015. Tr. 61-71.

### B. Relevant Medical Evidence

In the summer of 2013, Hampton's reports to his primary care physician Gurpreet Randhawa, M.D., of double vision for several months and his history of pituitary abnormality prompted a brain MRI, which showed "multiple T2 and FLAIR lesion in periventricular white matter, right pons, and left medulla"—lesions concerning for multiple sclerosis ("MS"). Tr. 338, 356, 375, 389. Hampton was advised to see a neurologist. Tr. 362. He was also found to have a root canal abscess; he received treatment for the abscess and his double vision stopped. Tr. 375. Consequently, he did not follow up with a neurologist. Tr. 375.

On June 16, 2014, Hampton saw Dr. Randhawa for a follow-up for his hypertension. Tr. 343. He complained of bilateral hand tingling, with no weakness, for the last three weeks. Tr. 343. He reported that he had been taking his mother's Percocet for over five years due to body

aches and pains. Tr. 344. Upon examination, he had full strength, no pain to palpation of his hands, increased patellar reflexes, negative Tinel's and Phalen's signs, and appropriate mood and affect. Tr. 345. Dr. Randhawa opined that, given Hampton's complaints and exam, he did not have carpal tunnel syndrome but, rather, concern for MS. Tr. 346. Dr. Randhawa discussed the importance of discontinuing opiate use prescribed to others and again recommended Hampton follow up with neurology, noting that they had discussed this "on several occasions" in the past and that Hampton scoffed at the importance of doing so. Tr. 346.

On August 8, 2014, Hampton saw neurologists Nuttawan Vongveeranochai, M.D. and/or Edward Westbrook, M.D.[1] Tr. 389-394. He reported that, about five weeks prior, he woke up with bilateral hand numbness and tingling, worse on the left, and that he drops things. Tr. 389. The sensory disturbance spread to his left arm and it has been getting worse. Tr. 389. He also occasionally had pain in his neck. Tr. 389. Upon exam, he had decreased pinprick sensation in his left hand (the C6-7 dermatome), impaired joint positional sense in his fingers, and increased reflexes. Tr. 392. He had normal muscle bulk and tone, full strength, intact sensation to light touch and vibration, intact coordination and memory, and a normal gait, attention span, and concentration. Tr. 392. MRIs of Hampton's brain and cervical spine and lab work were ordered. Tr. 392-393. The brain MRI on August 9th showed interval development of multiple new lesions, many of which showed enhancement and features suggestive of acute and subacute demyelinating process. Tr. 423-424. The cervical MRI showed findings consistent with demyelinating process involving the spinal cord from the C2-3 level through the T3-4 level. Tr. 425.

On August 25, 2014, Hampton visited acute care at the neurology department for a flare-

---

[1] The treatment note is signed as authored by both neurologists.

up, reporting ongoing symptoms of hand numbness and urinary urgency. Tr. 375. Upon exam, he had decreased pinprick in the left C5, C6, C7 dermatomes, some mild impairment in joint position sense in his right toes, a normal gait, and an impaired tandem gait. Tr. 379-380. He had full strength, normal muscle tone, normal coordination, and intact memory and concentration. Tr. 378-379. He was diagnosed with MS and admitted for three days of intravenous steroid treatment to calm down his active lesions, then instructed to taper off steroids and follow up with his physician after he completed the course of steroids to discuss disease modifying medications. Tr. 382, 373. Upon discharge, his symptoms were significantly improved. Tr. 373.

On September 17, 2014, Hampton saw Drs. Vongveeranochai and Westbrook for a follow up. Tr. 384-388. He reported having more strength in his hands and no more left-arm numbness, although he continued to report a "prickly" sensation in both hands. Tr. 384. Otherwise, he had no complaints. Tr. 385. His examination findings were normal except for increased reflexes in the legs. Tr. 387. The doctors prescribed Tecfidera, an oral medication, in part because Hampton stated that he was going to Indiana for four months to train for a job, and advised that Hampton follow up with them when he got back from Indiana. Tr. 387-388.

On May 13, 2015, Hampton followed up with Dr. Vongveeranochai. Tr. 454-461. He had missed his February neurology appointment. Tr. 455. He reported starting the Tecfidera in early October with no major adverse reaction from it. Tr. 454. Since his last visit, he had experienced generalized fatigue. Tr. 455. He did not have to go to Indiana but instead stayed in Ohio to train for his job, but he was not able to do his job and eventually had to quit. Tr. 455. He lost his health insurance and, since November 2014 (a month after having started his Tecfidera), he cut his dosage in half because he was concerned about his insurance covering the cost; however, he had been on the full dosage for the past month. Tr. 455. He reported still

feeling stiff in his left hand and intermittent toe numbness. Tr. 455. He felt that his gait was off and had been feeling social stress and depression. Tr. 455. His mother called the office to express concerns that Hampton had cognitive impairments as well. Tr. 455. Upon exam, Hampton had decreased sensation to vibration in his extremities, increased reflexes, and mildly increased muscle tone in his extremities. Tr. 456-457. He had a normal gait, strength, and coordination, and a normal and intact mental status exam. Tr. 456-458. Dr. Vongveeranochai diagnosed relapsing-remitting MS and ordered a new brain MRI, although he noted that it may be difficult to assess the medication effectiveness due to Hampton's non-compliance. Tr. 460. Dr. Vongveeranochai continued Hampton's medication and added trazodone to help him sleep. Tr. 460-461. He referred him for a neuropsychological evaluation to assess any cognitive impairments, referred him to a primary care physician for other problems, and discussed with him whether he wished to see a psychiatrist for his depression, which he declined. Tr. 460-461. Hampton's brain MRI taken on May 17th showed a decrease in the size of several demyelinating plaques and resolution of associated enhancement of the plaques compared with the August 2014 MRI. Tr. 421.

On June 10, 2015, Hampton underwent a neuropsychological evaluation with neuropsychologist Philip Fastenau, Ph.D. Tr. 468-473. Dr. Fastenau observed Hampton to have a normal gait and movements, slow but fluent and articulate speech, logically-organized thoughts, and "somewhat awkward" social skills. Tr. 469. He showed good insight, no lapses in judgment, had a very dysphoric mood, and a restricted affect. Tr. 469-470. His sleep had improved since he started the trazodone. Tr. 470. Dr. Fastenau observed that he was cooperative during the testing although he cried many times. Tr. 470. He wrote, "indicators on this exam strongly suggest that Mr. Hampton's level of task engagement varied considerably across tests,"

and that, therefore, the results "likely underestimate his true cognitive abilities." Tr. 470. Hampton scored below expectation on measures of processing speed, although some speeded measures were normal, and scored extremely low on memory tests, even portions that "are passed by young children and people with dementia," which indicated his memory scores were due in part or entirely to poor effort. Tr. 470. Similarly, he scored very low on a measure of semantic fluency but with normal performance on other language measures, and he performed at expected levels on other measures including attention/concentration/working memory, executive functioning, verbal reasoning, visual-spatial reasoning, and novel problem-solving. Tr. 470. Dr. Fastenau remarked that "behavioral factors" were contributing to at least some of Hampton's low scores, likely including "stress and depression/anxiety" and possibly somatization and/or "motivation to appear worse than he really [was] for secondary gain (e.g., disability)." Tr. 471. He diagnosed "complaints of" memory loss and other cognitive and behavioral changes in the context of MS, depression, anxiety, and rule out somatoform disorder, for which he recommended cognitive-behavioral therapy, training in stress management techniques, and medication management. Tr. 471.

On August 19, 2015, Hampton saw Dr. Vongveeranochai, who noted that the May 2013 brain MRI showed improvement of Hampton's lesions and reflected good response to Tecfidera. Tr. 462. Hampton reported feeling imbalanced and that his gait was still off; his trazodone was helping his mood (he did not cry anymore) and sleep, and he had improved cognition and memory. Tr. 463. He stated that he was waiting for the results of his disability application before deciding whether to return to work. Tr. 463. Upon exam, he had normal attention, concentration, gait, and coordination; full strength; impaired positional sense in both hands; and heightened reflexes. Tr. 464-465, 467. Dr. Vongveeranochai assessed Hampton as clinically

stable on Tecfidera and continued his medications.  Tr. 467.

On November 11, 2015, Hampton saw Dr. Vongveeranochai for a follow-up.  Tr. 525.
He reported weakness in his left lower extremity and difficulty walking.  Tr. 525.  He stated that
his left knee shakes and that he struggles getting upstairs and up from a chair.  Tr. 525.  He
complained of mid to low back pain, which he has had for four to five years.  Tr. 525.  Upon
exam, he had decreased pinprick sensation in his left hand and on the left side of his back
between T2-T9.  Tr. 528.  His joint positional sense in his hands was intact.  Tr. 528.  He had
increased spasticity since his last visit.  Tr. 528.  He was able to rise out of a chair on one attempt
by pushing himself up, he had normal coordination, and his gait was slightly wide-based with his
left foot turned out, with difficulty performing tandem walking.[2]  Tr. 529.  Dr. Vongveeranochai
remarked that Hampton's MS had been relatively stable on Tecfidera, except for gait difficulty
"probably due to spasticity."  Tr. 529.  His medication was continued, he was referred to pain
management for his back pain, and lab work was ordered.  Tr. 530.  Physical therapy was
recommended, but Hampton declined.  Tr. 530.

On November 19, 2015, Hampton had a primary care visit and complained of worsening
back pain and trouble walking.  Tr. 494.  He reported falling more frequently.  Tr. 494.  Upon
exam, he had 4/5 strength in his left hip flexor and left knee extensor and, elsewhere, 5/5
strength, normal sensation, and a poor gait with decreased range of motion in his left lower
extremity.  Tr. 497.

On December 7, 2015, Hampton saw pain management specialist Jeffery Hopcian, M.D.,
for back pain.  Tr. 487-491.  He reported experiencing left sided weakness and discoordination
for several years and general achiness in his thoracic back and shoulders the last three months.

---

[2] Hampton had an injury to his left leg when he was 18 years old, and, since then, his left foot has deviated to the outside.  See, e.g., Tr. 375.

Tr. 487. His pain was worse with long periods of standing and improved with rest, massage, and use of his mother's opioid pain medication. Tr. 487. Upon exam, he had normal range of motion and strength in all extremities, tenderness to palpation in multiple levels of his thoracic spine, positive trigger points in his bilateral trapezius, and minor decreased range of motion of his cervical spine in all directions. Tr. 490. He had diminished sensation to pinprick in his left hand and leg. Tr. 490. Dr. Hopcian diagnosed back pain, likely unrelated to his MS, but more likely discogenic pain from his thoracic spine. Tr. 490. He ordered an x-ray, prescribed over-the-counter medication, recommended physical therapy, and advised Hampton to stop taking other people's medications, explaining that taking his mother's Percocet would make his pain worse in the long run. Tr. 487, 490.

On January 6, 2016, Hampton saw Dr. Vongveeranochai for a follow-up visit. Tr. 520. He reported difficulty walking, stiffness and weakness in his left leg and frequent falls, two major ones in the past month. Tr. 514-520. He was concerned about his gait and pain and requested an MRI. Tr. 520. He denied any new sensory disturbances. Tr. 521. He still had back pain and reported taking ibuprofen every two hours, taking his mother's Percocet from time to time, and he had not started physical therapy. Tr. 521. Upon exam, he was alert, interactive, cooperative, had normal attention, intact concentration, an appropriate mood, and fluent speech. Tr. 521. He had decreased muscle bulk in his calf muscle (gastrocnemius), spasticity in his arms and legs, full strength, increased reflexes, decreased sensation to pinprick on the left side in his arms, trunk and legs (50% compared to the right), normal coordination, and a spastic gait. Tr. 522-523. Dr. Vongveeranochai ordered an updated brain and cervical MRI to re-evaluate his current symptoms. Tr. 523. He prescribed a trial of Baclofen for Hampton's spasticity, noting, however, that it may make his gait worse, and urged him to start physical therapy. Tr. 523.

On February 3, 2016, Hampton returned to Drs. Vongveeranochai and Westbrook for a follow-up. Tr. 514-519. He stated that his spasticity is usually worse in the morning and after a hot shower. Tr. 515. The Baclofen made things worse and he stopped taking it. Tr. 515. His physical exam findings were the same as his prior visit. Tr. 516-517. The doctors observed that Hampton's recent, January 2016 brain MRI showed improvement in the lesions from the previous 2015 MRI, and that the cervical spine MRI showed a new T2 lesion at the C5-6 level that was larger when compared to the August 2014 MRI, but it otherwise showed improvement. Tr. 518-519. The doctors wrote, "Progression of spasticity causes him difficulty walking and disabling." Tr. 519. They continued his Tecfidera and started him on a very low dose of Dantrolene for his spasticity. Tr. 519.

On February 11, 2016, Hampton saw Lael Stone, M.D., for a second opinion regarding his MS. Tr. 545. He stated that the Dantrolene helped his tremors. Tr. 545. Trazadone helped his sleep, which, in turn, improved his mood, although he reported being angry. Tr. 546. His cognition was a lot better. Tr. 546. He complained that his walking was terrible (his left leg shakes and stiffens and he gets fatigue as the day goes on) and of a decreased energy level. Tr. 546. He reported two falls in the past three months. Tr. 546. He had been told to go to physical therapy but had not gone. Tr. 546. Upon exam, he was alert and had intact concentration, decreased muscle bulk in his left calf, spasticity in his left lower extremity, intact sensation, increased reflexes, normal coordination, and he was able to rise independently and had a spastic gait. Tr. 547-548. Dr. Stone remarked that Hampton's condition was currently declining on Tecfidera and that his neurological examination was concerning for spasticity, muscle bulk atrophy in his left calf, left lower extremity weakness, and clonus. Dr. Stone recommended switching to a different medication for his MS and planned bloodwork to decide which one;

meanwhile, he recommended a course of steroids. Tr. 549. He ordered blood panels to determine other causes of fatigue, physical therapy, and recommended a behavioral health evaluation. Tr. 550.

On February 15, 2016, Hampton underwent a psychological evaluation with Matthew Sacco, Ph.D., reporting various stressors and endorsing depression and worry. Tr. 556, 558. Upon exam, he was pleasant, cooperative, alert, and fully oriented, exhibiting normal speech and eye contact and an irritable affect. Tr. 559. He self-reported his mood as irritable, anxious, and angry. Tr. 559. He had logical, sequential, coherent, and relevant thoughts, intact cognition, and adequate insight and judgment. Tr. 559. His preoccupation with somatic concerns was marked. Tr. 559. Dr. Sacco commented that Hampton had been taking opioids for five to six years, increasing the dosage to at least 20mg a day currently. Tr. 559. Hampton was frustrated with medical professionals not treating his pain appropriately, so he continued to use his mother's opioid prescription. Tr. 559. Dr. Sacco opined that Hampton's "psychological and emotional immaturity in combination with his investment in his illness and sense of helplessness makes it difficult to differentiate between longer standing personality problems, symptoms related to substance abuse, and general lack of sophistication." Tr. 559. He diagnosed opioid abuse, depressive disorder, and rule out opioid dependence. Tr. 559.

The same day Hampton had a physical therapy evaluation with Matthew Sutliff, P.T. Tr. 581. He reported difficulty with his gait and stated that, although he was advised to get a cane, he had not done so; he wished to take a "walking pill," a drug that improves gait. Tr. 581. Upon exam, he had difficulty with rapid alternating movements of his left upper extremity and a mild instability in his gait. Tr. 584. He was assessed with decreased endurance, a mild coordination impairment on his left side, decreased sensation on his left side, impaired balance, an antalgic

gait pattern, and decreased strength in his lower extremities, left more than right. Tr. 585. Sutliff recommended four weeks of twice-weekly therapy and home exercises but noted only fair prognosis due to decreased motivation and a poor history of compliance with physical therapy. Tr. 585. At his third visit, Sutliff gave Hampton an ankle foot orthosis brace (AFO), which improved his gait. Tr. 588. Sutliff observed that Hampton's shoes were too large for him and recommended he be properly fitted for his next pair of shoes. Tr. 588.

By March 15, 2016, after six physical therapy sessions, Hampton demonstrated "improvement in gait quality, speed, endurance, and balance." Tr. 599. Sutliff encouraged him to return to work rather than continue pursuing disability, noting that Hampton had a job opportunity that was "perfect" for him and observing that he did not believe Hampton would be approved for disability. Tr. 599. By April 4, after two more visits, Hampton reported feeling stronger and Sutliff again "strongly encouraged" him to return to work "now" in one of two potential job options Hampton reported, one of which was a job allowing him to work from home, rather than pursue disability. Tr. 604, 607. His gait was improving with the use of his AFO. Tr. 605. Sutliff wrote, "Hampton has potential to work, including viable employment options, but he has yet to act on these options." Tr. 607. Hampton's mother's desire for him to go on disability was noted as a barrier. Tr. 607.

On April 8, 2016, Hampton saw Dr. Stone for a follow up. Tr. 615. Dr. Stone prescribed Lexapro for Hampton's mood and was still considering alternatives to Hampton's current MS medication, Tecfidera. Tr. 617. He prescribed Ampyra to help with walking. Tr. 617.

The same day, Hampton saw Dr. Sacco for a follow up. Tr. 610. He reported "spotty" depression caused by issues with girls he had dated. Tr. 610. He was taking at least four of his mother's Percocet a day and did not know the dosage. Tr. 610. He reported making "not much"

progress since his last visit. Tr. 610. His mental status examination produced normal findings other than "immature" behavior. Tr. 611. Dr. Sacco diagnosed opioid abuse and depressive disorder NOS and assessed a GAF of 60.[3] Tr. 611.

On May 31, 2016, Hampton saw Judith Scheman Baumann, Ph.D., at the Center for Neurological Restoration for a pain medicine evaluation. Tr. 627-632. He stated that his emotional symptoms had improved with taking Lexapro and denied depression, frustration, and irritability. Tr. 629. He reported anxiety. Tr. 629. Upon exam, he had all normal mental status findings except somatic preoccupation. Tr. 630. Dr. Baumann assessed a fear of injury contributing to deconditioning; "catastrophizing increasing pain, disability"; and depression and anxiety contributing to pain perception. Tr. 630. She suggested a three- to four-week intensive chronic pain rehabilitation program with substance abuse education. Tr. 630.

On June 14, 2016, Hampton saw Dr. Sacco. He reported that the Lexapro was "wonderful" and, "everything is great. I got a [] nice check from a class action suit from [his former employer]." Tr. 633. He felt "great" and had no motivation to return to work, stating, "If I don't have to work, I won't." Tr. 633. He resisted his doctors' recommendation to enroll in a chronic pain program. Tr. 633. His mental exam findings were normal except for immature behavior. Tr. 633-634. He was assessed a GAF score of 65.[4]

On July 12, 2016, Hampton returned to Dr. Stone and reported a much better mood on

---

[3] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*.

[4] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *See* DSM-IV-TR, at 34.

Lexapro; he was very happy with the Ampyra, reporting improved walking speed and coordination; and he had continued success with the Dantrolene helping his tremors. Tr. 637. He expressed concern that his short-term memory and concentration has declined over the last two months. Tr. 637. He continued to report difficulty walking (left leg weakness, dragging his foot and intermittent falls) but also stated that, although he had his ankle/foot brace at home, he did not use it. Tr. 637. Upon exam, he had reduced (5- or 4/5) left-leg strength, reduced left hand grip (5-/5), a hemiparetic gait on the left, and paretic arm movements on the left (Tr. 638-639). Dr. Stone remarked that they were waiting for the final word from Hampton's insurance to switch him from Tecfidera to a different MS medication, Tysabri. Tr. 639. He was still taking his mother's Percocet and was still considering whether he wanted to go back to work or pursue disability. Tr. 638-639. Dr. Stone recommended physical therapy for gait, balance, and back pain. Tr. 639. Later that month, Hampton began receiving Tysabri infusions. E.g., Tr. 690.

On October 12, 2016, Hampton saw Dr. Stone for a follow up and reported that his medications were helping and he was tolerating the infusions well. Tr. 690-692. He complained of fatigue, poor balance and poor memory/concentration. Tr. 691. He denied recent falls. Tr. 691. Upon exam, he had impaired left rapid alternating movements, impaired bilateral standing balance, and an unsteady, left hemiparetic gait. Tr. 692. His left hand grip and left lower extremity strength had decreased to 4/5. Tr. 692. Dr. Stone wrote that Hampton continues to feel that he is unable to work and was moving forward with disability, which Dr. Stone supported, due to his baseline left hemiparesis, unsteady gait and balance, severe fatigue, and left upper extremity dysmetria. Tr. 692.

On January 9, 2017, Hampton saw family practitioner Ye Zhu, M.D., to establish care. Tr. 643. Dr. Zhu noted that he walked with a normal gait without assistance and recommended

regular aerobic exercise.  Tr. 643, 645.

On January 24, 2017, Hampton had a neurological pain management evaluation.  Tr. 622. Upon exam, he had left arm and leg hemiparesis with increased tone and spastic and ataxic gait. Tr. 654.  He had pain upon palpitation of his bilateral paraspinal muscles.  Tr. 654.  It was opined that Hampton's MS and chronic pain have resulted in some degree of wide spread central sensitization and chronic pain syndrome.  Tr. 654.  He was again recommended to participate in the chronic Pain Rehabilitation program.  Tr. 655.

On January 30, 2017, Hampton had a follow up with Dr. Stone, reporting that he felt his disease was slowly progressing: his walking and short-term memory were worse, he had poor balance and a fall the previous month, and he had trouble swallowing pills.  Tr. 735.  His mood was stable on Lexapro and his trazadone helped his sleep.  Tr. 736.  His exam findings were the same as his last visit.  Tr. 736-737.  A brain MRI performed that same day showed stable changes, mild in severity, and no new plaques or enhancement.  Tr. 699, 737.  Dr. Stone ordered a cervical MRI to be completed prior to his next visit in six months and prescribed Gabapentin for pain.  Tr. 737.

On June 26, 2017, Hampton's cervical spine MRI showed three new lesions compared with the January 2016 study and showed overall progression and chronic demyelination.  Tr. 798-799.  There was no abnormal cord enhancement or significant canal or foraminal stenosis. Tr. 798-799.

### C. New Evidence submitted to the Appeals Council

On March 22, 2018, Hampton saw his physical therapist, Matthew Sutliff, for a Neuro Functional Capacity Evaluation.  Tr. 7-16.  Upon exam, he had gait abnormalities, including bilateral pes planovalgus, spasticity and left foot drop.  Tr. 10.  He scored 39/56 on the Berg

Balance test, indicative of safe ambulation but with an assistive device.  Tr. 10.  During the 6-minute walk test he was able to walk 1,075 feet, but suffered two "severe" trips on the left requiring a physical assist to prevent a fall.  Tr. 11.  Sensation to light touch was severely decreased in the left lower extremity.  Tr. 11.  His finger-to-nose and rapid alternating coordination was moderate to severely impaired on the left and mildly impaired on the right.  Tr. 11.  Sutliff considered the results of the evaluation valid and opined that there was evidence of significant and persistent disorganization of motor function in two extremities, fatigue consistent with MS, the MS would cause Hampton to miss three or more days per month, and he would require multiple unscheduled breaks.  Tr. 13-14.  Sutliff concluded, Hampton "is not qualified to work under even the least restrictive Dictionary of Occupational Titles (DOT) classification of sedentary physical demands," explaining that he had had a decline in his physical functioning as a result of his MS that renders him unable to perform any sustained, gainful employment.  Tr. 15.

### D. Medical Opinion Evidence

#### 1. Treating Source

On October 12, 2016, Dr. Stone completed a Multiple Sclerosis Questionnaire on behalf of Hampton.  Tr. 648-649.  He opined that, due to his MS, Hampton had psychological or behavioral abnormalities (memory impairment and disturbance of mood) that results in a marked restriction of activities of daily living, but no other restriction.  Tr. 648-649.  He also indicated that Hampton had significant fatigue of motor function with substantial muscle weakness on repetitive activity and persistent disorganization of motor function substantially interfering with the use of at least two extremities.  Tr. 648-649.  He stated that Hampton had weakness in his left arm (5-/5) and left leg (4-/5).  Tr. 649.

On January 30, 2017, Dr. Stone completed a physical residual functional capacity

assessment on behalf of Hampton.  Dr. Stone opined Hampton was limited to lifting 15 pounds occasionally but could not carry due to decreased balance; he could stand/walk for one hour total, 15 minutes uninterrupted; and he could sit for 6 hours total, 45 minutes uninterrupted, based on a physical capacity evaluation.  Tr. 650.  He stated that Hampton can never climb or crawl and could rarely balance, stoop, crouch or kneel due to weakness in his left arm and leg.  Tr. 650.  He could rarely push/pull and could occasionally reach and perform fine and gross manipulation.  Tr. 651.  Due to poor balance, he had environmental restrictions regarding heights, moving machinery, and temperature extremes.  Tr. 651.  He required a sit/stand option at will and he experienced moderate pain that interfered with his concentration, takes him off task, and causes absenteeism.  Tr. 651.  Additional limitations to functioning were identified as fatigue and decreased memory.  Tr. 651.

### 2. State Agency Reviewers

On September 11, 2015, state agency reviewing psychologist Courtney Zeune, Psy.D., reviewed Hampton's file and opined that he could sustain concentration to perform simple, repetitive tasks not requiring fine details or fast production pace, adapt to changes in a work environment if explained ahead of time, and engage in superficial interactions with co-workers in a less public setting.  Tr. 108-110.  On January 19, 2016, state agency reviewing psychologist Paul Tangeman, Ph.D., affirmed Dr. Zeune's opinion.  Tr. 143-146.

On September 8, 2015, state agency physician Maria Congbalay, M.D., reviewed Hampton's file and opined that Hampton could work at the light exertional level and frequently balance, stoop, kneel, crouch, crawl, handle, finger, and operate bilateral foot controls; occasionally climb ramps or stairs but not climb ladders, ropes, or scaffolds; and must avoid even moderate exposure to vibration and all exposure to hazards.  Tr. 105-107.  On January 21,

2016, state agency reviewing physician Gary Hinzman, M.D., affirmed Dr. Congbalay's opinion, adding that Hampton be limited to frequent feeling in the left hand. Tr. 141-143.

### E. Testimonial Evidence

#### 1. Hampton's Testimony

Hampton was represented by counsel and testified at the administrative hearing. Tr. 54. He testified that, on a typical day, he wakes up around 8:00 a.m., starts coffee, puts his grandmother's breakfast out, maintains the kitchen a little and then just sits and reads for the rest of the day. Tr. 71-72. He reads articles on his cell phone. Tr. 72. Other chores include vacuuming, laundry, and grocery shopping. Tr. 72. He has his two-year-old son from 4:00 p.m. on Tuesdays to 4:00 p.m. on Wednesdays and every other weekend. Tr. 72. His mother handles his finances because he has no money. Tr. 73. He does not do the chores every day due to pain and fatigue; if it doesn't get done one day, it will just wait until another time. Tr. 75. Sometimes his mother or grandmother will do them. Tr. 75.

When asked what prevents him from working, Hampton listed his pain, confusion, memory loss, and fatigue, which "is really huge for me." Tr. 73. When he performs the household chores previously mentioned, he does them in small stints, about 15 or 20 minutes. Tr. 73. And the apartment is very small. Tr. 74. Spasticity has also "become a really huge issue," more so lately, because the medication he takes for it—Dantrolene—is not really working anymore. Tr. 74. The spasticity occurs mainly in his legs; essentially, it is a stiffening of his muscles. Tr. 74. He also gets it a little bit in his neck. Tr. 74.

With respect to his pain, Hampton stated that it is in his neck and spinal/thoracic area. Tr. 76. His pain averages a 5/10; at the hearing it was about a 7 or 8 and he had just taken his medication. Tr. 76. Medication, relaxation, and lying down a little bit helps with the pain. Tr.

76.  His gabapentin makes him feel sleepy, dizzy, and "loopy."  Tr. 76.  His short-term memory is "pretty much gone"; if he mother asks him to get one or two things for her in the kitchen, he forgets what the items are, even after just one minute.  Tr. 76-77.  He has to sit in the kitchen and think about it for a really long time before he remembers.  Tr. 77.  It has gotten worse over the last two years.  Tr. 77.  He uses trazodone to help him sleep at night and he sleeps for eight hours.  Tr. 78.  However, he still feels fatigued throughout the day and typically naps around mid-day for an hour.  Tr. 78-79.  He also gets fatigued when he spends time with his son.  Tr. 80

When asked if he has problems going to the grocery store, Hampton stated, "just slowness and just in walking, you know, and pushing that cart."  Tr. 79.  He is usually winded by the time he gets home and has to relax for a little bit.  Tr. 79.  He doesn't carry groceries too much anymore unless it's one or two bags of something light, like diapers; otherwise he uses his son's cart to carry everything up to the apartment.  Tr. 79.  He is falling more as his disease progresses; he has probably fallen about four or five times in the past month.  Tr. 80.  He also has problems with his balance and his left side is weaker and affects the way he walks.  Tr. 81.  His whole left side is affected; his left foot is starting to curl up.  Tr. 81.  The doctors are trying to set him up with physical therapy and trying to find a replacement for his Dantrolene, since it is not working any more.  Tr. 81-82.

He has weakness in his left arm; it is not really much of a problem, but it is hard to lift and he uses his right arm for "basically everything."  Tr. 82.  He is right handed.  Tr. 82.  The last time he tried to carry something with his left hand was "the other day" when he was carrying some light groceries.  Tr. 82.  He was bringing them up from the garage to the elevator.  Tr. 82.  Everything that was "super heavy" was on his right arm and everything that was lighter he put on his left arm because it is not as good.  Tr. 82.

Hampton also has depression that is off and on.  Tr. 83.  It is affecting him more lately to the point that he increased his medication, which his doctors had told him was okay to do.  Tr. 83.  His depression ties in with his fatigue in that he doesn't want to do anything.  Tr. 83-84.  A lot of his depression just stems from having an MS diagnosis.  Tr. 84.  He had a lot going for him and had to quit a good job because of his MS problems.  Tr. 84.  In January and February 2017 he was referred to a speech therapist because his speech was stalling; he knew what he wanted to say but could not say it.  Tr. 84.  That has also been getting worse.  Tr. 85.

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 86-93.  The ALJ discussed with the VE Hampton's past work as a food service manager, dining room attendant, kitchen helper, fast food worker, and restaurant host.  Tr. 87-88.  The ALJ asked the VE to determine whether a hypothetical individual of Hampton's age, education and work experience could perform his past work or any other work if that person had the limitations assessed in the ALJ's RFC determination.  Tr. 88-89.  The VE answered that such an individual could not perform his past work but could perform other jobs in the national economy such as table worker, final assembler, and bonder.  Tr. 89-90.

## III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

---

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his November 15, 2017, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.  Tr. 25.

2. The claimant has not engaged in substantial gainful activity since February 7, 2015, the alleged onset date.  Tr. 25.

3. The claimant has the following severe impairments: multiple sclerosis (MS) and depression.  Tr. 25.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 26.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: can lift and/or carry 20 pounds occasionally and 10 pounds frequently; occasional push/pull with the left lower and upper extremity; can sit for six hours, stand for 2 hours, and walk for 2 hours in an 8 hour workday; he can operate foot controls frequently with the right foot and occasionally with the left foot; frequently handle and finger items bilaterally; frequently feel with the left hand; can occasionally push and pull with the left lower and upper extremities; can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; can occasionally balance; frequently stoop, kneel, crouch, and crawl; never work at unprotected heights or near moving mechanical parts; can tolerate no more than occasional exposure to vibrations; limited to performing simple tasks, but not at production rate pace; as well as frequently interact with supervisors, coworkers, and the public.  Tr. 28.

6. The claimant is unable to perform any past relevant work.  Tr. 34.

7. The claimant was born in 1988 and was 27 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 34.

8. The claimant has at least a high school education and is able to communicate in English.  Tr. 34.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 34.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 34.

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 7, 2015, through the date of this decision. Tr. 35.

## V. Plaintiff's Arguments

Hampton challenges the ALJ's decision on two grounds: (1) the ALJ failed to follow the treating physician rule and (2) new and material evidence supports remanding this case. Doc. 14, pp. 13-21.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the

case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §

404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling

weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to

any subsequent reviewers the weight given to the treating physician's opinion and the reasons for

that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider

factors such as the length, nature, and extent of the treatment relationship; specialization of the

physician; the supportability of the opinion; and the consistency of the opinion with the record as

a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th

Cir. 2007).

 Hampton argues that the ALJ violated the treating physician rule when he gave "little"

weight to Dr. Stone's opinions. Doc. 14, p. 13. The ALJ considered Dr. Stone's opinions:

> Dr. Stone opined that the claimant can occasionally lift 15 pounds; walk a total of 1 hour
> in an 8 hour workday; sit for a total of 6 hours in an 8 hour workday; rarely balance,
> stoop, crouch, and kneel; never climb or crawl; rarely push/pull; occasionally reach and
> use fine/gross manipulation; and has marked restrictions in activities of daily living, as
> well as, left leg and left arm weakness. Dr. Stone's MS questionnaire indicates that the
> claimant meets a listing (Exs. 11F; 12F) The opinion of a treating physician must
> ordinarily be given substantial or considerable weight unless good cause is shown to the
> contrary. A treating physician's medical opinion on the issue of the nature and severity of
> an impairment is entitled to special significance and, when supported by objective
> medical evidence of record, is entitled to controlling weight (20 CFR 404.1527(d) and
> 416.927(d). I am unable to accord controlling weight because Dr. Stone's opinions are
> significantly more restrictive than is supported by evidence in the medical record. Based
> on physical examinations, the claimant exhibited mild to moderate abnormalities related
> to MS, but otherwise appeared normal (Exs. 2F; 3F; 6F; 7F/2-6; 10F). Diagnostic
> imaging also confirmed that the claimant's MS was stable (Exs. 14F/41; 16F).
> Additionally, the claimant stated that he takes care of his elderly grandmother, does
> laundry, vacuums, and goes grocery shopping. For these reasons, I give little weight to
> Dr. Stone's opinion.

Tr. 33.

 Hampton argues that the ALJ failed to cite appropriate objective evidence in support of

his reasoning. Doc. 14, p. 15. He asserts that the treatment notes cited by the ALJ were based

on examinations that pre-dated Hampton's alleged onset date and/or were assessed by providers other than Dr. Stone. Doc. 14, p. 15. He also contends that the ALJ erroneously described the diagnostic evidence. Doc. 14, p. 18. The Court agrees.

The ALJ's statement that Hampton's physical exam findings showed mild to moderate abnormalities but otherwise appeared normal is not supported by the record evidence cited to and discussed by the ALJ. In his section discussing Dr. Stone's opinion, the ALJ cites to five records. Tr. 33 (citing Exs. 2F; 3F; 6F; 7F/2-6; 10F). Two of these exhibits (2F, 3F) are from 2014 and predate Hampton's alleged onset date; in fact, some of the records appear to predate Hampton's official MS diagnosis. These have little apparent relevance to the limitations assessed by Dr. Stone in January 2017.

Exhibit 6F is a 28-page exhibit that primarily includes treatment notes from Hampton's visits for gastrointestinal issues prior to the time he began treating with Dr. Stone. Exhibit 7F/2-6 is a visit with Dr. Vongveeranochai, whom Hampton saw prior to seeing Dr. Stone. And Exhibit 10F is a treatment note from Hampton's primary care physician, during the time period he was treating with Dr. Stone, that indicated that he walked with a normal gait without assistance. Tr. 644. The ALJ does not cite any treatment notes from Hampton's visits with Dr. Stone and the only treatment note the ALJ cites that is contemporaneous to Hampton's visits with Dr. Stone is one visit with a primary care physician who observed a normal gait. The cited records do not support the ALJ's conclusion that Dr. Stone's opinions are not supported by physical exam findings.

This is especially so because, elsewhere in his decision, the ALJ recites that Hampton, early on, had mostly normal examination findings, but glosses over the fact that his physical examination findings gradually worsened over time. For instance; in an August 2015 visit with

Dr. Vongveeranonchai, Hampton had full strength; a normal, stable gait; normal coordination; increased reflexes; and impaired joint positional sense in both hands. Tr. 464-465. In February 2016, he had spasticity in his arms and legs; full strength; increased reflexes; decreased sensation on his left side: arm, leg, and trunk; normal coordination, and a spastic gait. Tr. 516-517. The ALJ noted the impaired joint positional sense in both hands in the August 2015 treatment record and noted the spasticity in Hampton's arms, legs, and gait in his February 2016 treatment record, but also described both visits exam findings as "generally normal." Tr. 30.

The ALJ noted that, at Hampton's first visit with Dr. Stone, Hampton had muscle bulk atrophy in his left calf muscle, left lower extremity weakness, and clonus, i.e., more abnormal exam findings. Tr. 30. And by January 2017, the day Dr. Stone completed his RFC assessment, Hampton had even more abnormal exam findings: impaired coordination, impaired balance, 4/5 strength in all areas of his left leg and left hand grip, and an unsteady, left hemiparetic gait. Tr. 736-737. Notably, the ALJ did not discuss the January 2017 exam findings. In other words, the ALJ's generic assertion that Hampton had "mild to moderate abnormalities related to MS, but otherwise appeared normal," is not a sufficient, complete explanation, and it does not accurately depict the longitudinal record evidence of Hampton's physical exam findings, i.e., they gradually worsened.

Additionally, the ALJ stated that MRI imaging confirmed that Hampton's MS was stable. Tr. 33. While true that Hampton's January 2017 brain MRI was considered stable, showing no new T2 lesions (Tr. 31, 33, 798), his June 2017 cervical spine MRI showed more than three new T2 lesions and showed a progression of the disease compared to his January 2016 cervical spine MRI. Tr. 799. The ALJ did not comment upon this July 2017 cervical spine MRI result. The ALJ's statement that Hampton's MS was stable based on diagnostic imaging, therefore, is not

accurate.

In sum, the ALJ primarily relied upon earlier portions of the record less favorable to Hampton and his analysis falls short under the treating physician rule. Thus, it cannot be said that substantial evidence supports the ALJ's findings that Dr. Stone's opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and not consistent with the other substantial evidence in the case record. *See Wilson*, 378 F.3d at 544. The ALJ's decision, therefore, must be reversed. *Id*. at 546 (reversing when the ALJ's assessment of the treating physician's opinion is not supported by substantial evidence).

To be sure, Hampton was repeatedly non-compliant with treatment, as the ALJ remarked. Tr. 31, 32. He was unwilling to participate in physical therapy, despite having enjoyed significant improvement once he did; he did not do his home exercises; he routinely defied orders to stop taking his mother's Percocet and was warned that taking it would make his pain worse in the long run; his gait improved when he used an ankle/foot brace but he did not use the brace; and he did not follow up with his providers' recommendations regarding mental health treatment and participating in a chronic pain rehabilitation program. He routinely stated that he was not interested in working, despite being urged to do so, instead preferring to pursue disability. Tr. 32. It was opined that he did not put forth full effort in his neuropsychological exam. Tr. 29. It may very well be that his non-compliance with treatment caused his worsening symptoms. It may be, that if found to have a disabling condition during the relevant period, that condition would not reach all the way back to his alleged onset date. It also may be, that after further review, the ALJ will again find that Hampton's limitations were not as severe as Dr. Stone opined, and that Hampton was not disabled at all during the relevant period. These are all

questions the ALJ will have an opportunity to take up on remand.[6]

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED** and

**REMANDED** for proceedings consistent with this opinion.


IT IS SO ORDERED.



Dated: May 10, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge

---

[6] Additionally, Hampton will have an opportunity to present the March 2018 neuro functional capacity evaluation obtained after the ALJ's decision.